### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

RAYMOND D. GRAVES,

     Plaintiff,

v.                                 Case No: 8:20-cv-270-CEH-JSS

AVIS BUDGET GROUP, INC.,

     Defendant.

_____

### <u>ORDER</u>

This cause comes before the Court upon Defendant Avis Budget Group, Inc.'s Motion for Summary Judgment (Doc. 36), Plaintiff Raymond Graves' Opposition to Motion for Summary Judgment (Doc. 41), and Defendant's Reply (Doc. 43).

In this employment discrimination action brought under the Florida Civil Rights Act, Plaintiff alleges that Defendant retaliated against him for making an allegation of disability-related harassment in 2014 by terminating his employment in 2016. Defendant now requests that summary judgment be entered in its favor because it alleges there is no record evidence establishing a causal connection between Plaintiff's harassment allegation and his termination, and, in any event, Plaintiff has not shown that the non-retaliatory reason for the termination was pretextual. Having considered the motion, the response, and the parties' Joint Stipulation of Agreed Material Facts, and being fully advised in the premises, the Court will grant Defendant's Motion for Summary Judgment.

## I.   FACTUAL BACKGROUND[1]

### A. Joint Stipulation of Agreed Material Facts (Doc. 40)

Plaintiff Raymond Graves ("Plaintiff" or "Graves") became employed by Defendant Avis Budget Group Car Rental Services ("Avis" or "Defendant") at the Tampa International Airport on or about November 19, 2012. Doc. 40 ¶¶ 1, 2.  Avis employees are subject to a Code of Conduct that prohibits threats or acts of violence, including verbal or physical fighting on company premises. *Id.* at ¶¶ 5, 6.  Violating the Code of Conduct is grounds for termination of employment. *Id.*

As a Rental Sales Associate ("RSA"), Plaintiff was required to stand when assisting customers with rental transactions.  *Id.* at ¶¶ 3, 9.  After Plaintiff experienced an accident in January 2014, he returned to work following a medical leave and was granted an accommodation that he be allowed to sit as needed. *Id.* at ¶¶ 7, 10.  On March 29, 2014, Plaintiff contacted the employee hotline to make a complaint that Operations Manager Wendell Marlon was harassing him about his accommodation, telling him to stand and kicking and punching the back of his chair. *Id.* at ¶¶ 11, 13. He also complained that Airport Manager Ainsworth Pothemont had sanctioned Marlon's harassment. *Id.* at ¶ 13.

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including declarations and exhibits, as well as the parties' Joint Stipulation of Agreed Material Facts Regarding Defendant's Motion for Summary Judgment (Doc. 40).  For purposes of summary judgment, the Court considers the facts in the light most favorable to the non-moving party as required by Fed. R. Civ. P. 56.

Plaintiff's hotline complaint was investigated by a Human Resources ("HR") employee named Shayla Wilson, who informed Plaintiff she would investigate the matter and would speak to management so that everything would stop. *Id.* at ¶¶ 15, 17.   Soon afterward, Marlon and Pothemont spoke with Plaintiff about the hotline complaint and threatened his job if he could not adhere to management's rules. *Id.* at ¶ 18.   Plaintiff states that his conversations with Wilson and with Marlon and Pothemont were the only times anyone spoke to him about the hotline complaint. *Id.* at ¶ 19.   Plaintiff did not contact the employee hotline again. *Id.* at ¶ 12.

## B. Additional Testimony / Evidence

### 1. *Deposition of Plaintiff Raymond Graves and Related Exhibits (Doc. 36-1)*

Plaintiff testified that during his employment at Avis he experienced what he termed "harassment" by many of his managers, including and at the direction of Pothemont and Marlon. Doc. 36-1 at 42:157-44:165.   Marlon harassed him whenever he needed to sit down due to his medical condition; Pothemont would back Marlon up and refuse to discipline Marlon. *Id.* at 44:167-45:171, 49:186-50:190.   Plaintiff made the hotline complaint about Marlon and Pothemont because he was sick of the harassment occurring. *Id.* at 44:168.   After meeting with Wilson, Plaintiff did not hear anything further about her investigation into his complaint. *Id.* at 47:177. However, Marlon and Pothemont called him into Pothemont's office within a month to tell him he should have gone through the proper channels, and that if he could not adhere to the rules of management then he could not work at Avis anymore. *Id.* at 47:178-49:185.

Marlon continued to harass Plaintiff by kicking his chair and telling him to stand up until Marlon was moved to a different job site a few months later. *Id.* at 49:188-50:189. Plaintiff continued to experience harassment by Pothemont and other managers for the remainder of his time at Avis, which he attributes to retaliation for his hotline complaint. *Id.* at 50:191-92, 62:240, 63:242-44. Although no one ever brought up the hotline complaint, Pothemont and the managers would always give Plaintiff a hard time. *Id.* at 42:158-43:164, 52:200-53:201.

Plaintiff was suspended and ultimately terminated from his employment at Avis after an incident on December 12, 2016. *Id.* at 58:222, 58:224-59:225. He testified that a coworker named Caitlin Potter started a verbal dispute with him in the break room, to which he responded to defend himself. *Id.* at 56:213-214. He did not yell or curse at her, raise his arm, or physically approach her. *Id.* at 56:214-57:217, 58:224. He only used the "F word" after Potter used it first. *Id.* at 58:223. When Candace Murphy came in to tell them to stop arguing, Plaintiff walked away. *Id.* at 56:216. Plaintiff said that both Murphy and Potter falsely described the incident. *Id.* at 57:217. He noted that it would have been impossible for Murphy to have physically separated them like she said she did because Plaintiff is much larger than either of the women. *Id.* at 57:219-20.

As part of Avis's investigation into the December 12 incident, Plaintiff wrote a brief statement describing his version of events. *Id.* at 129. Plaintiff also met with Pothemont and another manager named Chris Cunha. *Id.* at 57:218-19. After Plaintiff

admitted that he and Potter had engaged in a verbal altercation, Pothemont told him "I've got you now." *Id.* at 57:218-19, 58:221.  Plaintiff interpreted this remark to be a reference to his 2014 hotline complaint. *Id.*  He believes his termination was Pothemont's decision, and that Pothemont had been looking for a reason to terminate him for the last two and a half years because of the hotline complaint. *Id.* at 58:221-22, 59:225-26.

Aside from the December 12 incident, Plaintiff was unaware of any accusation against him involving Candace Murphy. *Id.* at 55:209-211.  He denied that he had ever made sexual comments to her, although he did not know why she would submit a false complaint about him. *Id.* at 55:211.  He also denied being told by a manager named Ben Oehrig not to make vulgar jokes. *Id.* at 55:211-12.  However, Plaintiff agreed that there were two other incidents in which he was the subject of complaints or disciplinary action.  On one occasion he was counseled by a manager named Ishwar Ramnath. *Id.* at 51:195-52:197.  Plaintiff denied Ramnath's allegations of misconduct and of raising his voice during the conversation. *Id.*  Plaintiff also described an accusation of sexual harassment by a manager named Samantha Baez, which he denied and attributed to Pothemont's influence over Baez in retaliation for the hotline complaint. *Id.* at 52:199-54:205.  Responding to Baez's accusation in writing at the time it was being investigated, Plaintiff said that he felt he was being attacked for personal reasons. *Id.* at 54:205-06; 125-127.

Plaintiff explained that he knew of two other individuals who had been accused of similar misconduct to him who were not terminated.  At least two women had

accused Marlon of sexual harassment. *Id.* at 59:226-27.   And a woman named Mercedes had cursed out her bosses (including Ainsworth Pothemont) multiple times without being subject to disciplinary action. *Id.* at 59:227-60:229.

### 2.   *Testimony of Tiffany Gates and Related Exhibits (Docs. 36-3, 42-2)*

Tiffany Gates is Defendant's HR manager for the state of Florida. Doc. 42-2 at 11.   She was one of three individuals who made a "collective" decision to terminate Plaintiff, along with HR Director Lisa LaMarca and Joshua Striblen, Pothemont's direct supervisor. *id.* at 108; Doc. 36-3 ¶ 17.   Gates explained that Plaintiff was terminated because he violated the Avis Code of Conduct during the December 12 incident by being rude, abusive, and threatening to his coworkers and engaging in threats or acts of violence, including verbal or physical fighting. *Id.* ¶ 21.   The termination letter sent to Plaintiff listed the same reason for his termination. *Id.* at 32.

Gates personally investigated the December 12 incident, which entailed interviewing Plaintiff and Potter about three to four days later. Doc. 42-2 at 22-23, 25, 33.   Potter had made a written statement regarding the incident on the same day it occurred. Doc. 36-3 at 24-26.   Potter stated that she and Plaintiff got into an argument because he had left the sales counter while a customer was waiting a few minutes earlier. *Id.* at 24-25.   When Potter told him, "Well that doesn't mean you have to f--- the rest of us over," she alleged that Plaintiff "charged at me, hovering over me with his finger in my face," while repeatedly cursing at her. *Id.* at 25.   Murphy, who witnessed the argument, got in the middle of them to tell Plaintiff to "get out of

[Potter's] face." *Id.*   Potter explained that she felt "extremely threatened and scared that he was going to do something more than yell at me just based off how close he got to my face looking down on me while I was sitting and eating." *Id.*

Although there was no video of the incident, Gates found Potter's account credible, observing her during the interview to be clearly scared and upset by the incident. *Id.* at 34-35, 111.  Gates's interview notes also indicated that, while Plaintiff's description of the incident was much less aggressive than Potter's, he told Gates he had been so angry that he blacked out. *Id.* at 33.[2]

Gates emphasized that Potter's account was substantiated by the written statement of another witness, Murphy. *Id.* at 109.  Murphy's statement explained that she overheard the argument between Potter and Plaintiff. Doc. 36-3 at 28.  After Potter said "So that means you can f--- other people over," Plaintiff "went right up to her as she was sitting at the table and stood over her with a loud voice and raised his arm." *Id.*  Murphy intervened, telling Plaintiff "There's no need for you to yell like that." *Id.*  Murphy felt the need to jump in because "[h]e escalated very fast, and I feel like…what he did was intimidating and over the top.  He was <u>yelling</u> the word f--- and it was enough to make me jump in." *Id.* (emphasis in original).

---

[2] Gates referred in her testimony to having consulted the notes she took during her investigation of the December 12 incident. *Id.* at 25, 33.  However, Gates also explained that she had lost all her investigative files in 2017 due to a computer crash, although she was able to recover some material from physical files or her email. *Id.* at 51-52, 65-66.  Gates did not identify any specific documents from the December 12 incident investigation that she could not recover.

Gates explained that Potter was not suspended or formally disciplined for the December 12 incident because her behavior had not been physically threatening or harmful. *Id.* at 122.  Although she was "spoken to" about her use of inappropriate language, Gates believed that Potter's actions had been fairly justified and did not warrant disciplinary action. *Id.* at 124-128.  Gates explained that there is "flexibility" in discipline decisions, which are always made on a case-by-case basis. *Id.* at 128.  The decision regarding whether to discipline Potter was made in the same conversation as the decision to terminate Plaintiff. *Id.* at 127.

While the substantiated December 12 incident was the "determining factor[]" in the termination decision, Gates noted that the decision also would have been justified by the "pattern of complaints made by women of aggression about him" and his "history of misconduct." Doc. 42-2 at 109; Doc. 36-3 ¶ 18, 21.  The decisionmakers reviewed prior complaints that were in his personnel file when making the decision and considered the situation in light of his "overall work record." *Id.* ¶ 17; Doc. 42-2 at 75.  However, the prior allegations were not directly considered in the termination decision because they were not substantiated. *Id.* at 140.

One prior incident in Plaintiff's personnel file was a note from Operations Manager Ishwar Ramnath dated March 23, 2015. Doc. 36-3 at 10.  Ramnath stated that he counseled Plaintiff for frequently disappearing from the sales counter, and that Plaintiff became verbally combative during the conversation. *Id.*

In another note, dated December 4, 2016, manager Ben Oehrig stated that he counseled Plaintiff for his use of vulgar comments and jokes, resulting from remarks

Plaintiff had made on November 28, 2016. *Id.* at 18.   Accompanying Oehrig's note was a Voluntary Statement Form written by Candace Murphy on December 6, 2016. *Id.* at 20-21.   She described an incident that had occurred on November 28 in which Plaintiff had made a sexual remark to her in front of a group of people. *Id.*   Murphy explained that Oehrig had reached out to her to express his concern about Plaintiff's remark. *Id.*   She stated that Plaintiff sometimes "goes too far" and it made her feel uncomfortable. *Id.*   Gates described Oehrig's note as a "documented verbal warning" in Plaintiff's file, which is considered a low-level disciplinary sanction. Doc. 42-2 at 78.   Gates was not involved in the investigation of this incident, but she believes it was resolved through Oehrig's counseling conversation with Plaintiff. *Id.* at 79.   She did not know whether the incident was substantiated. *Id.*

Gates was personally involved in the investigation of a sexual harassment complaint against Plaintiff by a manager named Samantha Baez in December 2015. Baez reported to her direct supervisors, including Ainsworth Pothemont, that Plaintiff had made inappropriate comments and gestures toward her on an escalating basis for about two months. Doc. 36-3 at 12-13.   Pothemont notified Gates about the allegations, which Gates then investigated by interviewing both Baez and Plaintiff. Doc. 42-2 at 36-40, 56-59.   There were no witnesses to the alleged harassment, and ultimately Gates concluded the allegations could not be substantiated because it was Baez's word against Plaintiff's. *Id.* at 40, 60-61.   Baez resigned soon afterward. *Id.* at 62.

Gates testified that she did not become aware that Plaintiff had made a complaint to the employee hotline in 2014 until after the incident on December 12, 2016.  On the day that Plaintiff was suspended, he stated that the managers had never liked him because he made a complaint two years earlier related to a medical accommodation.  *Id.* at 104, 115, 117-18.  At the time he made this comment no decision to terminate Plaintiff had been made.  *Id.* at 116-118.  Although Gates did not ask him what he meant, she later came across documentation of the hotline complaint—the complaint itself and the investigation notes of Shayla Wilson, Gates's former direct report—when reviewing his personnel file in the course of her investigation.  *Id.* at 117-119; 97-99.   Wilson's notes from 2014 indicated her conclusion that the managers had not acted inappropriately, but that coaching and retraining was needed regarding the company's accommodation process.  *Id.* at 99. Gates did not remember telling the other decisionmakers about Plaintiff's hotline complaint in the termination discussions.  Although she agreed it was "possible" she told them, she felt that the complaint had been properly resolved and there was "no need to go down the rabbit hole" by bringing it up.  *Id.* at 119-20.

Gates also explained that hotline complaints are not contained in the personnel file that is kept in the employee's work location, because they are "typically withheld" from the location.  *Id.* at 145.  They are instead maintained at the HR headquarters in Fort Lauderdale.  *Id.*   Gates does not recall where she located Plaintiff's hotline complaint, but states that it would not have been in his personnel file in the airport office.  *Id.*

### 3.  Deposition of Joshua Striblen and Related Exhibits (Docs. 42-3, 42-4)

Joshua Striblen was the District Manager who supervised Ainsworth Pothemont and Pothemont's co-airport manager during the time of Plaintiff's employment. Doc. 42-3 at 6, 8.  He was one of the three decisionmakers in Plaintiff's termination decision. *Id.* at 18.  Striblen testified that the termination decision was a mutual agreement among the three decisionmakers, although "the final decision to terminate would come from our HR side of the business," specifically Lisa LaMarca, Gates's supervisor. *Id.* at 19.  He did not recall the specific phone conversation in which the decision was made. *Id.* at 22.

Striblen did not participate directly in the investigation into the December 12 incident because he was not located on-site; he instead relied on the airport managers' initial investigation, followed by HR's review of their investigation. *Id.* at 21.  Striblen did not recall any reference to retaliation during the investigation. *Id.* at 32.  He was aware that Plaintiff had received a medical accommodation, and stated that it was standard practice to keep accommodation documents in personnel files. *Id.* at 31.

In determining whether to recommend termination, Striblen conferred with his "team," which included Pothemont, and "would listen to anyone's opinion." *Id.* at 20-21.  He did not recall whether Pothemont recommended terminating Plaintiff. *Id.* at 20. Striblen also reviewed all documents in Plaintiff's personnel file, which included the report of the November 28 incident and other "past events" in the file. *Id.* at 23-26. Ultimately, Striblen relied on the reports of the November 28 incident in addition to

information from the employees involved in the December 12 incident and those who had investigated that incident, Gates and Pothemont. *Id.* at 33.

### 4. *Other Evidence (Docs. 36-2, 42-2, 42-4)*

Ainsworth Pothemont submitted a declaration in which he denied telling any employees to make complaints about Plaintiff. Doc. 36-2 ¶¶ 5-7.  He also denied making the decision to terminate Plaintiff's employment or telling him "I got you now." *Id.* at ¶¶ 8-9.

Defendant's records indicate that Plaintiff was approved for leave under the Family Medical Leave Act ("FMLA") and short-term disability leave on several occasions.  He took medical leave from January 3, 2014 through March 4, 2014, returning with a doctor's note indicating that he could not stand for prolonged periods. Doc. 42-2 at 188.  He took leave again from May 19, 2015 to September 8, 2015, and again in February 2016. *Id.* at 189.

On October 20, 2016, Plaintiff received a letter notifying him that he was approved for intermittent FMLA leave from September 22, 2016 through March 21, 2017. Doc. 42-2 at 167-68.  Gates did not receive this letter, and she testified that leave approval documents are not located in an employee's personnel file because they come from a third-party vendor. Doc. 42-2 at 134, 136.  However, the vendor sent an email to Striblen and Gates containing the same information on November 6, 2016, and November 13, 2016. Doc. 42-4 at 23, 27.  On each occasion, Striblen forwarded the email to other individuals including Wendell Marlon and Ainsworth Pothemont. *Id.*

Defendant's employment records for Plaintiff indicate that he was hired on November 19, 2012, and was terminated effective December 23, 2016. Doc. 42-4 at 22. The document includes the notation "(Terminated)" after his name in six out of eight locations, including the main heading. *Id.*

## C. EEOC Complaint and the Instant Action

Plaintiff filed a Charge of Discrimination with the EEOC in February 2017. Doc. 36-1 at 131. He alleged that he was retaliated against by management after reporting harassment due to a reasonable accommodation he had received for his disability. *Id.* He had been suspended and terminated for having an argument with a white female coworker, who was not suspended or terminated. *Id.* at 133. In addition to retaliation, he alleged discrimination based on his disability, race, and gender. Defendant responded to the EEOC Complaint in a letter dated March 20, 2018, in which it denied the allegations and detailed Defendant's employment history. Doc. 42-4 at 186-191.

Plaintiff filed the instant action on February 4, 2020. He initially brought one count of retaliation under the Americans with Disabilities Act ("ADA") and one count of retaliation under the Federal Civil Rights Act ("FCRA"), alleging that Defendant retaliated against him for reporting disability-based harassment by his supervisor (Doc. 1). The count of ADA retaliation was dismissed with prejudice as time-barred (Doc. 19). Defendant now moves for summary judgment on the remaining count.

13

## II.   LEGAL STANDARD

Summary judgment is appropriate only when the court is satisfied that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law" after reviewing the "pleadings, the discovery and disclosure materials on file, and any affidavits[.]" Fed. R. Civ. P. 56(c)(2).   In determining whether a genuine issue of material fact exists, the Court must consider all the evidence in the light most favorable to the nonmoving party. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003). Issues of fact are "genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A fact is "material" if it may affect the outcome of the suit under governing law.  *Id.*

The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. "Only when that burden has been met does the burden shift to the non-moving party." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

"[I]n order to survive summary judgment, the nonmoving party must set forth specific facts showing there is a genuine issue for trial." *Johnson v. New Destiny Christian*

*Ctr. Church, Inc.*, 826 F. App'x 766, 770 (11th Cir. 2020) (citing *Anderson*, 477 U.S. at 249-50). "[U]nsupported 'conclusory allegations' do not suffice." *Middlebrooks v. Sacor Fin., Inc.*, 775 F. App'x 594, 596 (11th Cir. 2019). Likewise, "[a] 'mere existence of a scintilla of evidence' cannot suffice to create a genuine issue of material fact." *Johnson*, 826 F. App'x at 770 (quoting *Anderson*, 477 U.S. at 252).

## III.   DISCUSSION

Under the Florida Civil Rights Act, which is analyzed under the same framework as the ADA,[3] the plaintiff can establish a *prima facie* case for retaliation by proving the following elements:

1. he engaged in a statutorily protected expression,
2. he suffered an adverse employment action, and
3. there was a causal connection between the two.

*St. Louis v. Fla. Int'l Univ.*, 60 So.3d 455, 460 (Fla. 3d DCA 2011); *see also Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016).

Once the plaintiff has established a *prima facie* case, the burden of proof shifts to the employer to articulate "a legitimate, non-discriminatory explanation" for taking the adverse action. *See Ring v. Boca Ciega Yacht Club Inc.*, 4 F.4th 1149, 1163 (11th Cir.

---

[3] *See, e.g.*, *Sicilia v. United Parcel Service*, 279 F. App'x 936, 939 n.6 (11th Cir. 2008) (FCRA retaliation claims are analyzed under the same framework as ADA retaliation claims); *Holly v. Clairson Industries, LLC*, 492 F.3d 1247, 1255 (11th Cir. 2007) ("disability-discrimination claims under the FCRA are analyzed using the same framework as ADA claims"); *State v. Jackson*, 650 So.2d 24, 27 (Fla. 1995) ("a long standing rule of statutory construction in Florida recognizes that if a state law is patterned after federal law on the same subject, the Florida law will be accorded the same construction as given to the federal act in the federal courts").

2021),[4] citing *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999). Courts have described the employer's burden as "exceedingly light." *Change v. Midtown Neurology, P.C.*, No. 21-11405, 2022 WL 2352339 (11th Cir. June 29, 2022), quoting *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1060-61 (11th Cir. 1994).  "If an employer clears this 'low bar' of production, the plaintiff's *prima facie* case is rebutted, all presumptions drop from the case, and the plaintiff is then required to show that the employer's proffered reason for the action is a pretext for discrimination." *Barber v. Cellco P'ship*, 808 F. App'x 929, 934 (11th Cir. 2020) (citing *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015).  A reason cannot be proved to be a pretext for retaliation unless it is shown both that the reason was false and that retaliation was the real reason. *See Ring*, 4 F.4th at 1163, citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

Here, Defendant first asserts that Plaintiff has failed to establish a *prima facie* case of disability retaliation under the FCRA.  For the purposes of the summary judgment motion, the parties agree that Plaintiff engaged in a statutorily protected expression when he made a complaint in 2014 alleging harassment related to his disability. Doc. 36 at 12.  They also agree that he experienced an adverse employment

---

[4] The *Ring* Court noted that ADA retaliation claims are evaluated identically to claims under Title VII of the Civil Rights Act. *Ring*, 4 F.4th at 1163, citing *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997); *see also Double v. FedEx Ground Package System, Inc.*, 572 F. App'x 889, 895 (11th Cir. 2014) ("We evaluate ADA and FCRA retaliation cases under [the same framework]"); *Hernandez v. King Ocean Svcs.*, 20-24632-CIV-ALTONAGA/Torres, 2022 WL 2578652, *4 (S.D. Fla. July 6, 2022) (citing to *Stewart* and applying the same framework to FCRA retaliation claims).

action when he was terminated. *Id.* Finally, they agree, for the purpose of the motion for summary judgment, that there is no *direct* evidence of retaliation. Doc. 36 at 11-12; Doc. 41 at 8. Where they disagree is whether Plaintiff can demonstrate a causal connection between the two events that would establish retaliation through circumstantial evidence. Defendant argues that there is no temporal proximity between the two events, which are separated by 33 months, and that there is no other evidence that ties the harassment complaint to the termination. Doc. 36 at 15-16. In response, Plaintiff asserts that there is evidence that the 2014 complaint was brought to the attention of the decisionmakers before Plaintiff was terminated. Doc. 41 at 10-11. And he asserts that their actual knowledge of his complaint, coupled with the "extensive evidence that the two events were not unrelated," establishes a *prima facie* case of retaliation. *Id.* at 9-11.

In the alternative, Defendant argues that summary judgment is warranted because Defendant had a legitimate, non-retaliatory reason for terminating Plaintiff: his violation of company policies on December 12, 2016, as well as his prior instances of misconduct. Doc. 36 at 16. Defendant contends that Plaintiff has not provided evidence from which one could reasonably conclude that but for Plaintiff's protected act, Defendant would not have fired him, such that the reason Defendant identified could be considered a pretext. *Id.* at 17-18. Plaintiff responds that much of the support for Defendant's purported reason for the termination is inadmissible hearsay, which cannot be considered at summary judgment. Doc. 41 at 3, 11. Plaintiff also argues,

*inter alia*, that the fact that other individuals were not terminated for similar misconduct demonstrates that the reason was mere pretext. *Id.* at 12-13.

### A. A Reasonable Jury Could Find that There is a Causal Connection Between the Protected Activity and Plaintiff's Termination.

First, the Court finds that Plaintiff has established a *prima facie* case of retaliation. Although temporal proximity does not exist between the hotline complaint and the termination, there is no dispute that at least one decision-maker had actual knowledge of the hotline complaint before terminating Plaintiff. Further, there are material issues of fact regarding the influence that Plaintiff's alleged harasser—whom he alleges began harassing him shortly after learning Plaintiff had made a hotline complaint about him—had on the termination decision. Accordingly, a reasonable jury could find that the two events were not wholly unrelated.

Courts in the Eleventh Circuit interpret the causation element of retaliation broadly. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1278 (11th Cir. 2008). To demonstrate that there is a causal connection between the protected activity and the negative employment action, "a plaintiff merely has to prove that [they] are not completely unrelated." *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998) (quoting *EEOC v. Reichold Chems, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993) (internal quotation marks omitted).

As a threshold step, the plaintiff must demonstrate that the decisionmaker of the adverse employment action was actually aware of the protected activity. *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997). Conclusory allegations,

speculation, and inferences are insufficient to demonstrate actual knowledge. *See Mohammed v. GHX Global Healthcare Exchange, Inc.*, No. 21-10108, 2022 WL 1615925, *3 (11th Cir. May 3, 2022) (rejecting argument that knowledge could be inferred or that constructive knowledge was sufficient), citing *Raney*, 120 F.3d at 1197.

A plaintiff can establish causation upon a showing of actual knowledge coupled with temporal proximity between the protected activity and the adverse action. *See Hughes v. Wal-Mart Stores East, LP*, 846 F. App'x 854, 858 (11th Cir. 2021) (citations omitted). "Absent any other evidence tending to show causation, a claim of retaliation fails as a matter of law if there is a substantial delay between the protected expression and the adverse action." *Id.* (quoting *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004)). However, courts have noted that "temporal proximity…is not the only way to prove causation." *Hughes*, 846 F. App'x at 858.

Here, the parties dispute whether there is evidence of actual awareness by the decisionmakers of Plaintiff's protected activity, the 2014 hotline complaint. Defendant argues that Plaintiff cannot prove that two out of the three decisionmakers were actually aware of his hotline complaint. Doc. 36 at 14-15. Plaintiff contends that the evidence "unequivocally" shows that all of the decision-makers were "fully-aware" of the complaint at the time they rendered their decision. Doc. 41 at 10-11.

It is undisputed that one of the decisionmakers, Gates, was actually aware of the hotline complaint at the time of the decision to terminate Plaintiff. Gates testified that Graves made a vague comment about it on the day he was suspended, and that

she then came across the complaint and corresponding investigation summary when reviewing his employment records. Doc. 42-2 at 115, 117-119.

There is no direct evidence that the other two decisionmakers, Striblen and LaMarca, were aware of the hotline complaint. Contrary to Plaintiff's arguments, the evidence does not establish that Gates "expressly brief[ed]" them about "the contents of Graves's entire personnel file, including the March 2014 hotline complaint." Doc. 41 at 10-11. Rather, Gates testified that, while it was "possible" she told them about the hotline complaint, she did not recall doing so because it appeared to have been properly resolved and she felt that "there was no…further need to go down a rabbit hole." Doc. 42-2 at 119-120. Striblen did not testify that the hotline complaint was part of the termination discussion, stating only that the decisionmakers "would go back over any past events" and that he would have reviewed all of the documents in Graves' personnel file before making the decision. Doc. 42-3 at 25-26. It is unclear, however, whether the hotline complaint was contained in the version of the personnel file that Striblen reviewed. Gates initially testified that she accessed the hotline complaint and the summary of Wilson's investigation out of Graves' personnel file, both at the time of the termination and as recently as the day before her deposition. Doc. 42-2 at 98-99, 119. She later clarified that hotline complaints "are typically withheld from" the local office, and are instead retained in the office of the HR director

in Fort Lauderdale. *Id.* at 145.[5]   When she accessed the hotline complaint and investigation summary, then, she must have done so by "collect[ing] files from whatever I could get," either from the Fort Lauderdale office or from Wilson's old files. *Id.* at 145-46.  The witnesses' testimony therefore establishes only the possibility that Striblen and LaMarca were aware of the hotline complaint, rather than their actual knowledge, which is not sufficient.

However, Defendant does not provide any authority for its implied contention that Plaintiff must prove the actual knowledge of *all* participants in the termination decision. Doc. 36 at 15.  While the decision was "mutual," Doc. 42-3 at 18, there are indications that Gates, the participant with actual knowledge, had significant influence over it.  Striblen testified that in making the decision he relied on information from Gates, as the Human Resources investigator of the December 12 incident, and that ultimately the final decision to terminate came from "our HR side of the business." *Id.* at 19, 33.  Plaintiff has provided enough evidence to survive summary judgment on the issue of actual knowledge.

On the other hand, knowledge alone is not enough to establish causation. Plaintiff acknowledges that the most common method of proving causation, temporal proximity, is unavailable because there is insufficient proximity between the 2014

---

[5] The retention of the hotline complaint in the office where LaMarca worked does not, alone, provide evidence of LaMarca's actual knowledge of it. *See Mohammed*, 2022 WL 1615925, *3 (constructive knowledge is not sufficient); *cf.* Doc. 41 at 11.

hotline complaint and the 2016 termination. Doc. 41 at 9-10;[6] *see also* Doc. 36 at 15-16.  He argues instead that he has established causation by "the Defendant's ongoing awareness of the complaint, up to and including the conversation wherein the decision to terminate Graves was made." Doc. 41 at 10.  As evidence, Plaintiff asserts that Graves was "persistently poorly treated" during the intervening years, and he "repeatedly told the Defendant that he felt he was being retaliated against." *Id.*

The Court does not agree with Plaintiff's description of the evidence or its legal theory.  Contrary to Plaintiff's claim, there is no evidence that Graves brought up the hotline complaint himself on any occasion besides the suspension discussion in December 2016.  His written statement for the 2015 Baez investigation states only that he believed he was "be[ing] attacked for personal reasons," without any hint as to what those reasons might be. Doc. 42-2 at 158; *cf.* 41 at 10.  In addition, Plaintiff testified that no one ever brought up the hotline complaint *to* him after the single conversation with Pothemont and Marlon that occurred shortly after he made it. Doc. 36-1 at

---

[6] Plaintiff's Opposition raises an "alternative theory" that Defendant terminated Plaintiff because it "got tired of accommodating" his disability. Doc. 41 at 13-14.  Plaintiff points out that there is both actual knowledge and temporal proximity between Plaintiff's receipt of intermittent FMLA leave in November 2016 and his termination. *Id.*  However, the Complaint does not allege a count of FMLA retaliation. *See* Doc. 1.  It is "well-settled that a plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Matamoros v. Broward Sherriff's Off.*, 2 F.4th 1329, 1337 (plaintiff was not permitted to change the protected activity she was alleging at the motion to dismiss stage) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1212, 1315 (11th Cir. 2004)); *cf. Ozorowsky v. Bayfront HMA Healthcare Holdings, LLC*, 8:20-cv-2564-VMC-AEP, 2021 WL 3725247, *11 (M.D. Fla. Aug. 23, 2021) (Covington, J.) (although a long period of time separated the protected activity from the plaintiff's termination, a reasonable jury could find that a different, earlier adverse action constituted the retaliation). Here, the action cannot survive summary judgment based on a new type of protected activity that is alleged for the first time in a brief opposing summary judgment.

50:190-91.  Nor does he point to any statement or conduct by Pothemont or any other individual that ties the complaint to, or identifies the cause of, either the harassment he alleges by Pothemont or his ultimate termination. *See id.* at 43:163 (other managers never told him why they were allegedly told to harass Plaintiff).  Further, Plaintiff's position that "Defendant's ongoing awareness" of the protected activity, alone, is enough to establish causation is refuted by the caselaw. *See Higdon*, 393 F.3d at 1220-21 (where employer had knowledge of protected expression three months before alleged adverse action, some other evidence of causation was required in the absence of temporal proximity).

However, a reasonable jury could conclude causation exists because of Pothemont's alleged ongoing harassment coupled with his influence on the termination decision.  Plaintiff alleges that Pothemont began harassing him after he learned Plaintiff had named him in the hotline complaint, and that the harassment continued until his termination. Doc. 36-1 at 47:180-48:181, 50:190-91, 60:230, 62:240, 63:242-44.  Although the purported harassment itself does not rise to the level of an adverse action, its ongoing nature does create a temporal link between the hotline complaint and the termination.  Moreover, as Plaintiff points out, Pothemont, the alleged harasser, was involved in the decision to terminate him. Doc. 41 at 11.  Striblen testified that he not only conferred with Pothemont when making the decision to terminate, but "rel[ied] on" the information given to him by Pothemont—the initial investigator into the December 12 incident before Gates became involved. Doc. 42-3 at 19-21, 33.

Under a theory of causation known as the "cat's paw" theory,

> "causation may be established in a retaliation case if a plaintiff shows that the decisionmaker followed a biased recommendation without independently investigating the complaint against the employee[, thereby] using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's retaliatory animus.

*Blackmon v. Lee Mem'l Health Sys.*, 2:19-cv-625-JES-NPM, 2021 WL 808848, *6 (M.D. Fla. Mar. 3, 2021) (citations omitted). Where "the decisionmaker acted in accordance with the harasser's decision without herself evaluating the employee's situation... the harasser clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers." *Llampallas v. Mini-Cirs. Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998) (citations omitted).

Crucial to the cat's paw theory is the lack of an independent review by the decisionmaker, who instead merely "rubber stamp[s]" the harasser's recommendation. *Godby v. Marsh USA, Inc.*, 346 F. App'x 491, 493 (11th Cir. 2009); *Seal v. Todd Gen.*, 6:20-cv-1690-WWB-DCI, 2022 WL 1689179, *8 (M.D. Fla. May 26, 2022). In *Godby*, for example, the Eleventh Circuit rejected the cat's paw theory when the decisionmaker conducted his own review of all individuals selected for termination, who were then further vetted by three other individuals to examine how they were selected, what criteria were used, and whether there was a legitimate reason for their termination. 346 F. App'x at 493; *see also Graham v. Fanatics Retail Grp. Fulfillment, LLC*, 3:19-cv-1358-HES-JRK, 2021 WL 2868463, *9 (M.D. Fla. June 16, 2021) (no evidence that decisionmaker followed harasser's advice where decisionmaker testified that she alone decided to end plaintiff's employment); *Blackmon*, 2021 WL 808848 at *6

24

(evidence demonstrated decisionmaker alone made the decision to discharge plaintiff, although he "tr[ied] to keep his supervisors in the loop on these type of decisions").

Here, there is evidence that one of the three decisionmakers in Plaintiff's termination was influenced by the individual Plaintiff alleges harassed him for two years after Plaintiff named him in the hotline complaint.  Although Striblen said he reviewed Plaintiff's employee records himself, a material issue of fact exists regarding the extent to which he relied on Pothemont's investigation—and that of Gates, another individual with actual knowledge of the hotline complaint—rather than his own independent review of the December 12 incident when recommending Plaintiff's termination. *See Hyde v. Storelink Retail Grp., Inc.*, No. 8:07-cv-240-T-30MAP, 2009 WL 259392, *2–4 (M.D. Fla. Feb. 3, 2009) (Moody, J.) (summary judgment was not warranted where there was a material issue of fact regarding whether an influential non-decision-maker's discriminatory animus led to the plaintiff's termination); *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1565 (11th Cir.1987) (reversing summary judgment for employer where an issue of material fact remained as to whether an alleged harasser "influenced" a decision-maker to fire the plaintiff); *see also Schoenfeld v. Babbitt,* 168 F.3d 1257, 1268 (11th Cir.1999) (considering that although individual accused of discriminatory animus was not a final decision maker, he was "an integral part of [a] multi-level hiring process," and evidence regarding his conduct suggested "a discriminatory animus was at work that tainted the entire hiring process").

Although it is a close question, a reasonable jury could find that Plaintiff's termination was not "wholly unrelated" to his hotline complaint.  Given courts' broad

interpretation of the causal link element, *see Olmsted*, 141 F.3d at 1460, the Court finds that Plaintiff has established a *prima facie* case of retaliation.

### B. A Reasonable Factfinder Would Not Find that Defendant's Legitimate, Non-Retaliatory Reason for Termination Was Pretextual.

Nevertheless, Plaintiff cannot survive summary judgment as to the remaining elements of the analysis. Under the framework provided by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), once a plaintiff has established a *prima facie* case of retaliation, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action. *See*, *e.g.*, *Ring v. Boca Ciega Yacht Club Inc.*, 4 F.4th 1149, 1163 (11th Cir. 2021) (applying *McDonnell Douglas* framework to ADA retaliation claim). If the defendant meets that burden, to avoid summary judgment the plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that the proffered reason is a pretext for retaliation. *Id.*

Here, Plaintiff has failed to provide evidence that would allow a reasonable factfinder to conclude that the legitimate, non-retaliatory reason for Plaintiff's termination was a pretext for retaliation for his 2014 hotline complaint. Summary judgment is therefore warranted in Defendant's favor.

#### 1. *Legitimate Non-Retaliatory Reason*

Plaintiff first argues that Defendant cannot establish a legitimate, non-retaliatory reason for Plaintiff's termination without relying on inadmissible hearsay. Doc. 41 at 11. Specifically, Plaintiff asserts that several paragraphs of Gates's

declaration and accompanying exhibits constitute inadmissible hearsay. *Id.* at 3.[7] These paragraphs and exhibits relate to the reports alleging misconduct in April 2015, November 2016, and the December 12 incident. *See* Doc. 36-3 ¶¶ 8, 12, 13, 14, Exhs. C, E, F, G, H.  Without these reports, Plaintiff contends that Defendant cannot proffer a non-retaliatory reason for terminating Plaintiff.  In response, Defendant argues that the reports at issue are not hearsay because they are not offered for their truth, but rather for their effect on the listener; *receiving* the reports is what led to Plaintiff's termination, whether or not the factfinder believes the reports were actually true. Doc. 43 at 5-7.  Defendant also notes that the statements in Plaintiff's personnel file would also be admissible for their truth as business records and statements that could be authenticated at trial by the individuals who made them. *Id.* at 5 n.8.

Under Rule 56(e) of the Federal Rules of Civil Procedure, evidence that is offered in support for or opposition to a motion for summary judgment must be based on personal knowledge and contain facts that would be admissible in evidence. Accordingly, the "general rule" is that inadmissible hearsay cannot be considered on a motion for summary judgment. *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999).  The Eleventh Circuit has recognized, however, that district courts may consider hearsay statements that can be "reduced to admissible form"; the "most

---

[7] Although Plaintiff noted that a motion to strike was "forthcoming," none has been filed. Doc. 41 at 3 n.2.  The Court will consider the admissibility of the statements only to the extent that they impact the determination of the motion for summary judgment. *See Atlantic Marine Fla., LLC v. Evanston Ins. Co.*, 3:08-cv-538-HES-JBT, 2010 WL 19330977, *3 (M.D. Fla. May 13, 2010).

obvious way" to do so is by calling the affiant as a witness at trial. *Id.* (collecting cases); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012); *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996).  In addition, if the statement is not hearsay because it is not offered for the truth of the matter, or if it falls within an exception to the hearsay rule, then the district court may consider it on a motion for summary judgment. *Macuba*, 193 F.3d at 1323-24.

Statements that are not offered for their truth are not hearsay. *See* Fed. R. Evid. 801(c).  For example, a prior inconsistent statement that is offered for the sole purpose of impeachment is admissible. *Macuba*, 193 F.3d at 1324.  Similarly, if a statement is being offered to show its effect on the person hearing it, it does not qualify as hearsay. *See, e.g.*, *United States v. Harris*, 886 F.3d 1120, 1129-30 (11th Cir. 2018).  Courts have therefore considered out of court statements for these limited purposes in a motion for summary judgment. *See, e.g.*, *Blash v. City of Hawkinsville*, 856 F. App'x 259, 261 n.2 (11th Cir. 2021) (out-of-court statements that are introduced to show effect on the listener could be considered on summary judgment); *Goode v. Wild Wing Café*, 588 F. App'x 870, 874-75 (11th Cir. 2014) (evidence of complaints about plaintiff was offered to show employers' rationale for terminating him, rather than for the truth of the matter asserted); *Dierdorf v. Advanced Motion Therapeutic Massage, Inc.*, 19-CIV-62609-RAR, 2021 WL 65067, *3 n.1 (S.D. Fla. Jan. 6, 2021) (considering statement by deceased witness for limited purpose of its effect on the listener rather than its truth).  On the other hand, the court found that testimony about a statement heard secondhand by the witness that was offered to prove the speaker's discriminatory

intent was inadmissible hearsay that could not be considered on a motion for summary judgment, because it was being offered for its truth. *Shockley v. Barbee*, 747 F. App'x 754, 757 (11th Cir. 2018).

Here, the Court agrees with Defendant that the misconduct allegations recounted in Gates's declaration and accompanying exhibits are primarily offered for their effect on the decisionmakers in Plaintiff's termination, rather than for the truth of the allegations themselves.  The Court will therefore consider these allegations for this limited purpose.

Defendant also contends in a footnote that the witness statements attached to Gates's declaration (Doc. 36-3, Exhs. C, E, F, G, H) are admissible for their truth because they qualify as business records. Doc. 43 at 5 n.8. The Court does not agree. Gates' declaration does attest that the attached statements are true and accurate copies of records that were maintained in the regular course of business. *See* Doc. 36-3; Fed. R. Evid. 902(11), 803(6)(B), (D).  It is not clear, however, that statements were made as a regular practice of their car rental business; nor were all of the statements written down at or near the time the alleged events occurred. *See id.* at 803(6)(C), (A); *cf. Lewis v. Residential Mortgage Solutions*, 800 F. App'x 830, 833 (11th Cir. 2020) (contemporaneous documents of the type regularly produced in the regular course of loan business were admissible on summary judgment as business records).  On this record the Court cannot conclude that misconduct reports are admissible for their truth under the business records exception.

However, as Defendant also notes, the witness statements are capable of being reduced to admissible form at trial by calling the authors to testify. *See* Doc. 43 at 5 n.8; *Jones*, 683 F.3d at 1294; *Lewis*, 800 F. App'x at 834.  For example, Defendant states that Murphy, the author of two of the statements at issue, was deposed for this matter. Doc. 43 at 5 n.8.  While "the possibility that unknown witnesses will emerge to provide testimony…is insufficient to establish that the hearsay statement[s] could be reduced to admissible evidence at trial," *Jones*, 683 F.3d at 1294, here the authors' identities are known and there is no reason to believe they would be unavailable at trial. *See Lewis*, 800 F. App'x at 834.  Further, their statements are largely comprised of their personal observations. *See McMillian v. Johnson*, 88 F.3d 1573, 1585 (11th Cir. 1996) ("that the letter at issue was based on the writer's personal knowledge indicates that there was no impediment to the writer testifying at trial as to the facts described in the letter.").

In any event, whether or not the allegations within the witness statements are considered for their truth, it is clear that Defendant has provided a legitimate, non-retaliatory reason for Plaintiff's termination.  The employer's burden at this stage is a "low bar to hurdle" that does not involve any credibility assessments. *Flowers v. Troup Cnty., Ga., School District*, 803 F.3d 1327, 1336 (11th Cir. 2015).  Although Plaintiff contests the *veracity* of the witness reports, it is undisputed that two witnesses provided consistent statements in which they accused him of violating company rules during the December 12 incident. *See* Doc. 36-1 at 57:217-219; Doc. 36-3 at 24-28.  Further, the Avis Code of Conduct states that the violation of company rules may lead to

termination. *See* Doc. 36-1 at 38:143-40:151; 116-123.  Defendant has therefore met its burden of demonstrating a legitimate, non-retaliatory reason for the termination.

### 2. *Pretext*

Once the employer has provided a non-retaliatory reason for the adverse action, "the plaintiff's *prima facie* case is rebutted, all presumptions drop from the case, and the plaintiff is then required to show that the employer's proffered reason for the action is a pretext for discrimination." *Flowers*, 803 F.3d at 1336.  To survive summary judgment, then, Plaintiff must offer "enough probative evidence so that a reasonable jury might conclude" the reason for the termination was a pretext for retaliation. *See Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).  In considering this question, "[w]e must avoid weighing conflicting evidence or making credibility determinations," instead accepting as true all evidence of the non-movant and drawing all justifiable inferences in his favor. *Id.* (citations omitted).

As the Eleventh Circuit has "repeatedly and emphatically held, employers may terminate an employee for a good or bad reason without violating [the] law." *Flowers*, 803 F.3d at 1338, citing *Damon,* 196 F.3d at 1361 and *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir.1991) (quotations omitted).  "We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1361 (11th Cir.1999).  "The inquiry into pretext centers on the employer's beliefs, not the

employee's beliefs and...not on reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010). The question is whether the employer was dissatisfied with the plaintiff for "non-discriminatory reasons, even if mistakenly or unfairly so" or whether it instead merely used this incident "as cover" for retaliating against him. *Id.*

Here, Defendant alleges that it terminated Plaintiff because he violated the Avis Code of Conduct by "[b]eing rude, abusive or threatening to customers or coworkers," and through "[t]hreats or acts of violence, including verbal or physical fighting on Company premises[.]" Doc. 36-3 at 32. Gates explained that the December 12 incident alone constituted grounds for termination, and that the fact that it was substantiated by another witness was a determining factor in the termination decision. Doc. 42-2 at 74, 109, 140.

Plaintiff points to several pieces of evidence in the record to demonstrate that Defendant's proffered reason for the termination was pretext. These arguments will be taken in turn. First, in support of an "alternative scenario" that he was actually fired for taking FMLA leave,[8] Plaintiff claims Defendants' records reveal that the termination was planned well before the December 12 incident, because they purportedly state that Defendant "initiated the change of Graves' employment status to 'terminated'" at 8:45 PM on December 3, 2016. Doc. 41 at 14, citing to Doc. 42-4 at 22. But this view is not supported by the evidence, even making all reasonable

---

[8] As noted *supra*, n. 5, a claim of FMLA retaliation is not before the Court.

inferences in Plaintiff's favor.  In the document Plaintiff highlights, the only business process that corresponds with the date and time entry of 8:43 PM on December 3, 2016, is called "ID Change." Doc. 42-4 at 22.  In contrast, the business process called "Terminate" was not initiated until January 3, 2017. *Id.*[9]  Even viewing this record in the light most favorable to Plaintiff, it does not provide evidence of pretext or create a genuine dispute of fact.

Plaintiff further contends that the loss of some of Defendant's records about Graves merits an adverse inference in the Court's consideration of pretext because it "contributes to the general untrustworthiness of the Defendant's conduct and explanations[.]" Doc. 41 at 15.  However, Plaintiff does not assert that the loss constituted spoliation that was the result of bad faith, such that the sanction of an adverse inference would be warranted. *See, e.g., Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1183-84 (11th Cir. 2020).  Nor does Plaintiff identify any relevant records that are missing because of the computer crash that destroyed Gates's electronic files.  The Court therefore declines to infer that a document may have existed that would have provided evidence of pretext.

Next, Plaintiff argues that the reasons Defendant has provided for Graves' termination—specifically, which factors or events the decisionmakers considered—are

---

[9] Plaintiff may be relying on the notation "(Terminated)" that follows Raymond Graves's name after "ID Change"; however, this notation follows his name in nearly every business process entry regardless of date or topic, including the process called "Compensation Change" that was effective on July 16, 2016. *Id.*  The Court finds that no reasonable juror would conclude this notation indicates his termination was initiated on December 3.

inconsistent. Doc. 41 at 12.  Gates and Striblen each testified about the factors that went into their decision.  Striblen said that he considered both the November 28 allegation that was witnessed by a manager and the December 12 incident when he recommended that Plaintiff be terminated. *Id.* at 23-24, 33.  Gates said that, although she viewed the situation in light of Plaintiff's "overall work record," including the prior allegations, the December 12 incident was ultimately the only one that had bearing on her decision. Doc. 42-2 at 72, 74-75, 109, 140.   Given that the termination decision was made from the collective input of three individuals, *see* Doc. 42-2 at 108; 42-3 at 18, the Court does not find it inconsistent or incredible that slightly different rationales would underlie their individual recommendations.   In addition, both of their individual rationales were consistent with the reason provided in the termination letter. *Cf. Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1298-99 (11th Cir. 2006) (inconsistent evidence of reason for employee's discharge was evidence of pretext where termination documents stated one reason for the discharge while witnesses gave a different reason).  This evidence does not create a genuine dispute of material fact regarding the credibility of the stated termination reason.

Plaintiff also challenges the credibility of the reason for Plaintiff's termination because of the timing of his suspension, which demonstrated that Defendant "could not possibly have been terribly concerned about Graves being an actual danger to anyone else, seeing as it allowed Graves to work for the three days after the incident." Doc. 41 at 14-15.  The records before the Court do not indicate whether Plaintiff actually worked on the days between December 12 and 15.  But, in any event,

Defendant was not required to believe that Plaintiff presented a "danger" to anyone in order to terminate his at-will employment because of a rule violation.  After all, an employer "may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a [retaliatory] reason." *Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321, 1324 n.16 (11th Cir. 1998).  Defendant was entitled to conclude that a serious rule violation on a single occasion warranted termination, regardless of whether Defendant believed it would be repeated.

Finally, Plaintiff points to evidence of "comparators," other employees whom it alleges were treated differently despite committing the same conduct, arguing that these individuals' treatment demonstrates pretext. Doc. 41 at 12-13, 4.  Plaintiff states it is "undisputed that Potter violated the same policy Graves did," and "it is also undisputed that another individual named Mercedes was not terminated for substantially similar conduct." *Id.*   However, Plaintiff's claims are neither "undisputed" nor supported by the evidence, because neither individual was accused of the same conduct as Plaintiff.

A plaintiff may demonstrate that the stated reason for an adverse employment action was a pretext for unlawful activity by showing that the employer treated similarly situated individuals, or "comparators," differently. *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325-26 (11th Cir. 2020); *see also Damon*, 196 F.3d at 1363 (violation of work rule may be a pretextual reason for termination where other employees who engaged in similar acts were not similarly treated).  To be a

"comparator," an individual must be "similarly situated in all material respects." *Lewis v. City of Union City, Ga.* ("*Lewis I*"), 918 F.3d 1213, 1226 (11th Cir. 2019). "This determination relies on the individuals' substantive likenesses, and a comparator may be sufficiently similar if she has engaged in the same basic conduct (or misconduct) as the plaintiff, was subject to the same employment policies as the plaintiff, had the same supervisor, and shared the plaintiff's employment or disciplinary history." *Lewis v. Secretary of U.S. Air Force*, No. 20-12463, 2022 WL 2377164 (11th Cir. June 30, 2022), citing *Lewis I*, 918 F.3d at 1226-27 (quotations omitted).

Here, neither Potter nor Mercedes is a valid comparator. With respect to Potter, the parties agree that she and Graves had a verbal dispute on December 12 in which they both used profanity. Plaintiff denies raising his voice or physically threatening Potter during the dispute, and the Court assumes this to be true for the purpose of summary judgment. However, Potter and another witness both made written reports stating that Plaintiff did raise his voice and his hand while standing very closely to Potter. Doc. 36-3 at 24-28. There were no reports that Potter engaged in the same physical behavior or any conduct that could be considered physically threatening. Because Potter was not accused of the same misconduct, she is not a valid comparator. *See Lewis I*, 918 F.3d at 1226.

Plaintiff also testified that an employee named Mercedes cursed out her manager on more than one occasion. Doc. 36-1 at 59:227-28. It is unclear whether Plaintiff himself ever witnessed these incidents or if he was relying on unidentified secondhand reports, which would constitute inadmissible hearsay. *See* Section B(1),

*supra*.   Regardless, Plaintiff does not allege that Mercedes engaged in behavior that could be described as physically threatening during these incidents.   She therefore cannot be considered a valid comparator either.

Nor does the evidence support Plaintiff's characterization that "flexibility [in disciplinary sanctions] only extends to RSAs who are *not* Graves." Doc. 41 at 12 (emphasis in original); *see* Doc. 42-2 at 128 (Gates explains that there is flexibility upon violations of the rules).   Over the course of Graves' employment Defendant received multiple reports of his misconduct, including actions that were allegedly witnessed by managers.   As an at-will employee, Plaintiff could have been subject to termination for any of these alleged violations. *See* Doc. 36-1 at 119-122.   Instead, however, the evidence shows that Defendant investigated the more serious allegations to determine whether they were substantiated before taking any adverse action against Plaintiff. Doc. 42-2 at 60-61, 72; 36-3 at 12-16, 24-32.   For the other allegations, Defendant chose the lesser sanction of verbal counseling. *Id.* at 10, 18-22; Doc. 42-2 at 77-79. Moreover, throughout this time Defendant was accommodating Plaintiff's disability. *See* Doc. 41 at 13; *Jones v. Aaron's Inc.*, 748 F. App'x 907, 915 (11th Cir. 2018) ("Jones has also failed to show that her disability was the real reason for her termination.   If anything, the record evidence demonstrates that Aaron's had no problem with Jones's disability…fully adher[ing] to Jones's medical restrictions" on all but one occasion). Despite the prior allegations and the accommodations Plaintiff had been receiving since 2014, Defendant terminated Plaintiff only when a serious allegation of misconduct was supported by two consistent witness accounts.

"An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." *Damon*, 196 F.3d 1354, 1363 n.3.  Plaintiff does not dispute that Defendant received consistent reports from two individuals that he physically threatened Potter during the December 12 incident, even though Plaintiff denies doing so.  Defendant was entitled to credit these reports in making the decision to terminate Plaintiff, whether or not the reports were accurate. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991 (in evaluating pretext, the court must focus on whether the decisionmakers believed that the employee was guilty of the act and whether that belief was the reason for termination).  Plaintiff has failed to provide evidence with which a reasonable jury could conclude the reason for his termination was a pretext for retaliation.

As no genuine issues of material fact exist, Defendant is entitled to summary judgment in its favor.  Accordingly, it is **ORDERED**:

1. Defendant's Motion for Summary Judgment (Doc. 36) is **GRANTED**.

2. The Clerk is directed to enter judgment in favor of Defendant, terminate any pending motions, and close this case.

**DONE** and **ORDERED** in Tampa, Florida on August 15, 2022.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties